FOX ROTHSCHILD LLP
Fred Stevens
100 Park Avenue, 15th Floor
New York, New York 10017
(212) 878-7900

*Attorneys for the Estate of Hillel Kristal*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
In re                                                          :
                                                                    :         Chapter 11
CBGB HOLDINGS, LLC,                               :
                                                                    :         Case No. 10-13130 (SMB)
                            Debtor.                          :
------------------------------------------------------x

**MOTION OF THE ESTATE OF HILLEL KRISTAL FOR AN ORDER, PURSUANT TO 11 U.S.C. § 362(d), AND FED. R. BANKR. P. 4001, GRANTING LENDER RELIEF FROM THE AUTOMATIC STAY SO THAT IT CAN CONTINUE ITS STRICT FORECLOSURE AND LIQUIDATION OF ITS COLLATERAL IN SATISFACTION OF ITS CLAIMS, AND GRANTING LENDER ADEQUATE PROTECTION**

TO THE HONORABLE STUART M. BERNSTEIN,
UNITED STATES BANKRUPTCY JUDGE:

The Estate of Hillel Kristal (the "Kristal Estate"), by its counsel, Fox Rothschild LLP, as and for its motion for an order pursuant to 11 U.S.C. § 362(d), and Rule 4001(a) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), granting relief from the automatic stay and authorizing the Kristal Estate to liquidate its collateral, some of which continues to be in the possession of CBGB Holdings, LLC, the above-captioned debtor (the "Debtor"), and granting the Kristal Estate adequate protection; respectfully sets forth and represents:

**PRELIMINARY STATEMENT**

1.  CBGB (Country, Blue Grass, Blues) was an iconic music club located at 315 Bowery at Bleecker Street in New York City. CBGB was founded by Hillel "Hilly" Kristal

in December 1973, and the club became known as the birthplace of the American punk movement, regularly featuring acts like Patti Smith, the Ramones, the Misfits, Blondie and the Talking Heads. After over three decades of success, the club closed on October 15, 2006, following a dispute between the club and its landlord, the Bowery Residents' Committee, and attempts to get historic landmark status for the club. Although Hilly Kristal had plans to re-start the club in Las Vegas, those plans ultimately ended when sadly, Hilly died of complications from lung cancer on August 28, 2007.

2. Despite the closing of the club and unfortunate loss of Hilly Kristal, the name "CBGB" and its attendant trademarks, logos and other intellectual property, continued to have significant value. Those intellectual property assets and all other personal property assets, including much of the contents of the CBGB club are collectively referred to herein as the "CBGB Assets".

3. After significant marketing and negotiations, the Kristal Estate sold substantially all of the CBGB Assets to the Debtor in May 2008 for $3.5 million paid as follows: (i) advanced cash payment of $112,500; (ii) cash at closing of $1 million; and (iii) a promissory note in the principal amount of $2,387,500 (the "Note"). The Debtor's obligations under the Note are secured by all the CBGB Assets, and any cash or non-cash proceeds of the CBGB Assets. As detailed below, after numerous chances, opportunities and extensions granted by the Kristal Estate, the Debtor has defaulted on numerous monetary and non-monetary terms of the Note and related security agreements. The Debtor's bankruptcy filing came twenty-four (24) days after title to the assets was transferred to the Kristal Estate pursuant to the terms of the agreements between the parties.

2

4. As set forth below and as set forth in the affidavit of Brett Green, co-executor of the Kristal Estate, submitted in support of this Motion (the "Green Affidavit"), the Kristal Estate should be granted relief from the stay to continue its foreclosure and liquidation of the CBGB Assets for at least the following reasons:

- To the extent the Debtor even has title to any of the CBGB Assets, the Kristal Estate is not adequately protected. Based upon offers and interest in the CBGB Assets received after an extensive search, the Estate believes the assets are worth around $2.6 million. The current amount owed by the Debtor on the Note is approximately $2,583,258, which is increasing by at least $10,000 per month. Thus, to the extent the Estate had any equity in the CBGB Property, that equity is insufficient to cover the costs of disposing of the assets, either by the Debtor or the Kristal Estate.

- The Debtor cannot reorganize. It has failed to successfully market, use or sell the CBGB Assets for over two years. It has no means to propose a plan that will satisfy the provisions of the Bankruptcy Code, and invest the funds necessary to make the CBGB Assets financially successful. Indeed, the Debtor only filed a rushed, skeletal filing and has not made any proposal with respect to how it plans to get out of bankruptcy.

- There are numerous non-monetary defaults under the note and related documents that the Debtor cannot cure. For example, the Debtor has (i) failed to protect certain foreign registered intellectual property, including marks in the European Community and China, (ii) failed to protect valuable memorabilia and personal property assets by allowing mold to grow on them, and (iii) further encumbered the intellectual property assets by permitting another party to exercise control over them in violation of the agreements with the Kristal Estate.

## INTRODUCTION

5. On June 11, 2010, the Debtor filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York.

6. The Debtor has continued in possession of its assets and management of its affairs pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

7. To date, no trustee, examiner, or committees have been appointed in the Debtor's case.

3

## JURISDICTION

8. This Court has jurisdiction over this motion (the "Motion") pursuant to 28 U.S.C. §§ 157 and 1334, and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York (Ward, Acting C.J.), dated July 10, 1984.

9. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

10. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

a. **The APA, Note and Security Agreements**

11. On or around May 12, 2008, Lisa Kristal Burgman and Brett Green, as co-executors of the Kristal Estate (collectively, the "Co-Executors"), entered into an asset purchase agreement (the "APA") providing for the sale of the CBGB Assets to the Debtor for consideration comprised of an advanced cash payment of $112,500, cash at closing of $1 million, and the Note in the face amount of $2,387,500 [APA, p. 8, § 3.1]. A true and correct copy of the APA is annexed to the Green Affidavit as Exhibit A.

12. A summary of the salient provisions of the Note is as follows:

- Principal Amount - $2,387,500.00

- Interest – 5.00% per annum, calculated on a 30/360 day convention, with monthly payments to begin on the earlier of (i) sixty (60) days following the resolution of certain litigation dubbed the "Karen Claim"[1], or (ii) one year following execution of the Note.

- Due Date – The earlier of (i) sixty (60) days following the resolution of the Karen Claim, or (ii) three years following execution of the Note.

---

[1] The defined term "Karen Claim" in the APA referred to certain pending litigation between the Kristal Estate and Karen Kristal, Hilly Kristal's ex-wife, wherein Karen Kristal asserted an ownership interest in the CBGB Assets. The Kristal Estate and Karen Kristal reached a settlement of those claims on or around June 17, 2009.

4

- Rights Upon an Event of Default – (i) all unpaid principal and interest becomes immediately due and payable without presentation, demand or notice of any kind to Debtor; and (ii) the Kristal Estate may (a) obtain a release of any funds held in escrow pursuant to the APA, (b) obtain any escrowed documents being held in escrow, and (c) exercise all rights available to it as a secured creditor under applicable law, including, but without limitation, rights and remedies pursuant to Article 9 of the New York State Uniform Commercial Code, to secure repossession of the tangible CBGB Assets.

A true and correct copy of the Note is annexed to the Green Affidavit as Exhibit B.

13. The Debtor's obligations under the Note were secured by all the CBGB Assets pursuant to two security agreements signed simultaneously with the APA and Note, and titled and defined as, the "Tangible Assets Security Agreement" and the "IP Security Agreement" (collectively, the "Security Agreements"), true and correct copies of which are annexed to the Green Affidavit as Exhibit C and D, respectively.

14. On June 4, 2008, the Kristal Estate duly perfected its security interest in the CBGB Assets by filing a financing statement with the Delaware Department of State. A true and correct copy of the financing statement, along with an acknowledgment and certificate of the Secretary of State, is annexed to the Green Affidavit as Exhibit E.

15. In connection with the APA, Note and Security Agreements, the Debtor executed a series of documents that were placed into escrow pursuant to the terms of an Escrow Agreement between the Debtor, Kristal Estate, and Phillips Nizer LLP, as escrow agent. A true and correct copy of the Escrow Agreement is annexed to the Green Affidavit as Exhibit F. The documents executed by the parties and placed in escrow (collectively, the "Escrow Documents") were:

- An "Assignment and Assumption Agreement", pursuant to which the Debtor assigned to the Kristal Estate a series of contracts, leases and other agreements that were sold to the Debtor under the APA, a true and correct copy of which is annexed hereto as Exhibit G;

- A "Copyright Assignment", pursuant to which the Debtor assigned to the Kristal Estate all title, rights and interests in certain registered copyrights, a true and correct copy of which is annexed hereto as Exhibit H;

- A "Trademark Assignment", pursuant to which the Debtor assigned to the Kristal Estate all title, rights and interests in certain registered and unregistered domestic and foreign trademarks, and domain names, a true and correct copy of which is annexed hereto as Exhibit I; and

- A "Bill of Sale", pursuant to which the Debtor sold to the Kristal Estate all the CBGB Assets, a true and correct copy of which is annexed hereto a Exhibit J.

16. Pursuant to the Note, Security Agreements and Escrow Agreement, the Escrow Documents were to be released by the escrow agent to the Kristal Estate upon an uncured Event of Default by the Debtor [see Note, p.3, ¶b; IP Security Agreement, p. 11, § 7.1(g)(iii)(b); Tangible Assets Security Agreement, p. 12, § 7.1(g)(iii)(b); Escrow Agreement, p.3, § 3(b)(i)].

**b. Note Restatements, Acceleration, Default and Foreclosure**

17. Under the terms of the Note, interest payments were scheduled to commence by no later than May 21, 2009. At the request of the Debtor, the Kristal Estate agreed to a modification of the repayment terms under the Note. In or around July 2009, the Debtor executed, and the Kristal Estate agreed to accept, an amended and restated Note (the "Amended Note"), a true and correct copy of which is annexed hereto as Exhibit K. The Amended Note restated and modified the repayment terms under the Note as follows:

- The "Interest Payment Commencement Date" was moved from May 21, 2009, *to* the ninetieth (90th) day following the resolution of the "Karen Claim"; and

- The "Principal Payment Commencement Date" was moved from the earlier of (i) the sixtieth (60th) day following resolution of the "Karen Claim", or (ii) May 21, 2011, *to* the two hundred fortieth (240th) day following the resolution of the Karen Claim, with the full principal balance due on the later of (z) the new Principal Payment Commencement Date, or (y) May 21, 2011.

6

All terms of the original Note dealing with matters other than the timing of repayment were left unmodified by the Amended Note. In either case, *full repayment of the Note was due and owing by May 21, 2011.*

18. On or around June 13, 2009, the Karen Claim was settled and resolved by stipulation and the Debtor was informed of the resolution. Thus, pursuant to the Amended Note, monthly interest payments of $9,947.92 were due beginning on or around September 12, 2009, and the Amended Note matured and became due and payable on February 12, 2010.

19. The Debtor defaulted in its monetary obligations under the Amended Note on February 12, 2010 by failing to make the required principal repayment. No payments of any kind have been made on the Amended Note since the interest payment on February 12, 2010.

20. On February 24, 2010, the Kristal Estate issued a "Notice of Default" to all notice parties under the Amended Note and Security Agreements. A true and correct copy of the Notice of Default is annexed to the Green Affidavit as <u>Exhibit L</u>.

21. On March 24, 2010, the Debtor and the Kristal Estate entered into a forbearance agreement dated as of February 12, 2010 (the due date for the first principal repayment) (the "<u>Forbearance Agreement</u>") pursuant to which:

- The Debtor acknowledged receipt of the Notice of Default on or about February 24, 2010 [p.1];

- The Debtor acknowledged the Kristal Estate's acceleration of the Amended Note, and that it was fully due and payable, and that the Kristal Estate was entitled to add to the indebtedness all of its costs, fees and expenses including reasonable attorneys' fees incurred in enforcing its rights [p.2, ¶1];

- The Kristal Estate agreed to forbear and refrain from exercising its rights under the Amended Note and Security Agreements until May 18, 2010, during which time the Debtor had the right to satisfy the obligations under the Amended Note, or present to the Kristal Estate an agreement to sell some or all of the CBGB Assets, which if accepted by the Kristal Estate, must be consummated by June 18, 2010 [p.2, ¶3];

7

- The Debtor agreed that if the Debtor failed to meet the deadlines set forth in the Forbearance Agreement, then the Kristal Estate could, without further notice or obligation to the Debtor, immediately and finally foreclose on the CBGB Assets [p.3, ¶4];

- The Debtor executed a direction letter to the escrow agent under the Escrow Agreement, directing the release of the Escrowed Documents, which was to be held in escrow by Steiner & Kostyn, LLP, pending a default under the Forbearance Agreement (the "Direction Letter") [p.3, ¶5] (a copy of the Direction Letter is annexed hereto as Exhibit M);

- To the extent the Debtor failed to comply with the terms of the Forbearance Agreement, the Debtor agreed, among other things, that it had received notice sufficient for compliance with Sections 9-620 and 9-621 of the UCC, and waived entitlement to additional notice, any remedies or rights as a result of waiving such notice, any redemption rights, any rights to object to the Kristal Estate's sale of the CBGB assets [p.3, ¶6]; and

- The Debtor agreed that as additional consideration for the Forbearance Agreement, in the event the Debtor sold the CBGB Assets, then, after repayment of all obligations to the Kristal Estate, the Kristal Estate would be entitled to an amount equal to 25% of the remaining net proceeds of the sale [pp.4-5, ¶14].

A true and correct copy of the Forbearance Agreement is annexed to the Green Affidavit as Exhibit N.

22. The Debtor failed to repay its obligation to the Kristal Estate by May 18, 2010, as required by the Forbearance Agreement.

23. On May 20, 2010, Robert Steven Williams, the Member of the Debtor that signed the voluntary petition and related documents, sent to Scott Steiner, counsel to the Kristal Estate, an e-mail chain between the Debtor and the Debtor's European counsel, Dechert LLP, with respect to litigation regarding certain CBGB marks and related intellectual property in the EU, so that the Kristal Estate could take over the litigation. As detailed below, the Debtor failed to pay legal fees to Dechert LLP, and almost lost these valuable rights and claims for want of prosecution.

8

24.     In furtherance of the above exchange, on May 21, 2010, Mr. Williams sent another e-mail to Mr. Steiner, with a copy to James Blueweiss, another member of the Debtor, letting him know that there is an issue with a Chinese trademark coming up, and not to forget to take care of storage and insurance on the physical CBGB Assets.  The communications between the parties demonstrate that the Debtor acknowledged the forfeiture of the CBGB Assets caused by its May 18th default, and was facilitating the transfer.

25.     On May 27, 2010, the Kristal Estate delivered the Direction Letter to the escrow agent under the Escrow Agreement, and obtained the Escrow Documents.  Accordingly, the Kristal Estate currently holds an assignment and Bill of Sale executed by the Debtor transferring all the CBGB Assets back to the Kristal Estate.

26.     On June 4, 2010, counsel to the Kristal Estate delivered letters by certified mail to all known counterparties to the Debtor's contracts informing them that the CBGB Assets were transferred back to the Kristal Estate, along with a copy of the bill of sale and assignment and assumption Escrow Documents.  The following parties received letters: (i) Moishe's Self Storage; (ii) MVD Entertainment Group; (iii) Rock & Roll Hall of Fame; (iv) Eagle Leasing Corp.; (v) Bravado International Group; (vi) Iheartradio; (vii) Clear Channel Communications Inc.; (viii) Morrison Hotel Gallery; (ix) Guitar Hero/Activision Activision Blizzard; (x) Abrams Books; and (xi) Boom Entertainment.

c.     **The Debtor has Already Lost Title to the CBGB Assets**

27.     According to its filings, on June 2, 2010, the Debtor resolved to retain counsel and file a chapter 11 petition.  This was despite the fact that Debtor's management had already transferred certain attorney-client relationships to the Kristal Estate, and acknowledged the prior defaults and transfer of the CBGB Assets back to the Kristal Estate.

9

28. On June 10, 2010, the Kristal Estate recorded the assignment of the trademarks for the four versions of "CBGB", "CBGB & OMFUG", and the pending application for "CBGB 315 Bowery", with the U.S. Patent and Trademark Office. A copy of the verification of recordation is annexed to the Green Affidavit as <u>Exhibit O</u>.

29. On June 11, 2010, the Debtor filed its petition for relief in this Court, staying any further act by the Kristal Estate to liquidate the CBGB Assets pursuant to section 362(a) of the Bankruptcy Code.

**d.  The Kristal Estate Lacks Adequate Protection**

30. The Kristal Estate is currently owed $2,583,258 on its Amended Note, plus costs and reasonable attorneys' fees. The liquidation value of the CBGB Assets is approximately $2.6 million before deducting the costs associated with the sale.

31. In determining the value of the CBGB Assets, the Co-Executors considered the following facts as set forth in the Green Affidavit:

- The CBGB Assets were sold to the Debtor two years ago for $3,500,000, which was at the time determined to be the best offer after a robust marketing. The Debtor has been unable to even remain current on interest payments on its debt from the funds raised from the use of the CBGB Assets.

- When the CBGB Assets were sold to the Debtor in 2008, the club had been closed for little more than a year, and CBGB was constantly in the press garnering significant name recognition and cache. In the last two years, the amount of press and interest has decreased, further impacting on value.

- As contemplated by the Forbearance Agreement, the Debtor has been actively marketing and trying to sell the CBGB Assets for an amount that would at least satisfy the obligations to the Kristal Estate, but has been unable to do so. The Debtor's failed efforts indicate an unlikelihood that the CBGB Assets will fetch sufficient value to even satisfy the Amended Note.

- After reaching out to certain parties that were interested in purchasing the CBGB Assets in early-2008, the tentative, non-binding offers to purchase the CBGB Assets now are for approximately $2.6 million.

32. Also, the CBGB Assets are not being adequately preserved and are continuing to lose value. Interest is continuing to accrue on the Amended Note at approximately $10,000 per month, and, as detailed below, the Debtor is allowing much of the CBGB Assets to waste.

e.  **The Debtor has Failed to Protect the Kristal Estate's Collateral**

33. The Debtor did amazingly little with the CBGB Assets that it purchased over two years ago, to either protect them, generate income from them, or preserve them. Indeed, the Co-Executors are very concerned that the CBGB Assets have lost significant value since the sale.

34. For example, subsequent to the CBGB club's closing in October 2006, Hilly Kristal moved all the personal assets, fixtures, pictures and memorabilia of the club that had been accumulated over three decades, to three separate storage trailers. The idea was that if a new CBGB club were built, it could incorporate much of the legendary club's original fixtures and memorabilia. Unfortunately, Hilly passed away before a new club could be constructed. The personalty was then sold to the Debtor under the APA, and the Debtor has left the assets in the storage trailers where the Co-Executors are informed that mold has begun to grow and spread, damaging the property.

35. Also, the Debtor is not protecting the valuable trademarks and intellectual property in the European Community (United Kingdom, France, Italy, Spain, Portugal, German, etc). and China. Prior to the transfer of the CBGB Assets to the Debtor, Hilly Kristal had engaged Dechert LLP to handle certain trademark infringement proceedings against BCBG (BCBGMaxAzriaGroup, Inc.), the famous fashion line. The Debtor continued that fight after the CBGB Assets were transferred. However, following the May 18, 2010 default, Robert Steven

11

Williams sent an e-mail to Scott Steiner, the Kristal Estate's counsel, forwarding an e-mail exchange between Dechert LLP and the Debtor, indicating that[2]: (i) there was a deadline the following day, May 21, 2010, to file evidence and submissions related to the Debtor's opposition to BCBG's application to use certain trademarks; and (ii) the Debtor had not paid Dechert LLP, and Dechert LLP was refusing to do additional work without payment. The Kristal Estate has since taken over the Dechert LLP relationship with the Debtor's acquiescence, and has agreed to pay Dechert LLP £8,624 (about US $12,774) towards prior legal fees necessary to preserve certain CBGB Assets. If it were not for the Kristal Estate, valuable rights in the European Community would have been lost. After doing some research, the Co-Executors learned that there are also similar trademark issues in China, and that the fees necessary to maintain the Chinese trademark matters will need to be paid.

36. The Debtor has also violated the IP Security Agreement by granting Bravado International Group exclusive use and license to sell "CBGB" T-shirts. T-shirts were a valuable source of revenue prior to the transfer of the CBGB Assets to the Debtor. At the time of the transfer, the shirts were being sold in major retail outlets including Urban Outfitters, Urban.com, Virgin Entertainment, and T-Shirts.com. Upon information and belief, CBGB T-shirts are not available in any of those locations at this time. Not only has Bravado International underperformed in its obligations to market CBGB T-shirts[3], but the transfer of such rights to it was in violation of Section 6.3 of the IP Security Agreement, which expressly prohibits any conveyance, sale, assignment, lease, transfer or disposition of the CBGB Assets.

---

[2] The e-mail exchange may contain communications that are privileged. I have only included those portions of the conversation that are a matter of public record, or that do not involve strategy or other communications between the Debtor (or Kristal Estate as successor in interest) and Dechert LLP.

[3] The Kristal Estate has requested, but has not been given, a copy of the agreement or agreements between the Debtor and Bravado International.

37. If the Kristal Estate is not permitted to continue its sale of the CBGB Assets, it will be materially prejudiced as the Debtor has failed, and will continue to fail to protect the Kristal Estate's collateral.

## RELIEF REQUESTED

38. Section 362(a) of the Bankruptcy Code imposes a stay of, among other things:

> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;
>
> (4) any act to create, perfect, or enforce a lien against property of the estate;
>
> (5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;
>
> (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case. . . .

11 U.S.C. § 362(a)(6).

39. The Bankruptcy Code allows for relief from the automatic stay through Section 362(d), which states, in relevant part, that:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay –
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
> (2) with respect to a stay of an act against property under subsection (a) of this section if –
> (A) the debtor does not have an equity in such property; and
> (B) such property is not necessary to an effective reorganization;

See 11 U.S.C. § 362(d).

**a. The Debtor Lacks Equity in the CBGB Assets**

40. The allocation of burdens of proof in an action seeking relief from the automatic stay is set forth in section 362(g). The moving party carries the burden of proof only as to the debtor's equity in the property. The party opposing the lifting of the stay carries the burden as to *all other* issues. In re 160 Bleecker Street Associates, 141 B.R. 275, 281 (Bankr. S.D.N.Y. 1993) (emphasis added). In Roxrun Estates, Inc., 74 B.R. 997, 1002 (S.D.N.Y. 1987) ("The party moving for relief from the stay carries the burden of proof on the issue of the debtor's equity. . . while the party opposing such relief bears the burden of proof on all other issues."); In re Garsal Realty, Inc., 89 B.R. 140, 153-156.

41. Equity is the "difference between the property value and the total amount of liens against it." In re Stewart, 745 F.2d 1194, 1195 (9th Cir. 1984); In re Garsal Realty, Inc., 98 B.R. 140, 154 (Equity is "the remaining interest belonging to one who has pledged or mortgaged his property, or the surplus of value which may remain after the property has been disposed of for the satisfaction of liens.")

42. The Kristal Estate asserts that the CBGB Assets are worth at best $2.6 million, the approximate amount owed on the Amended Note, and thus, the Debtor lacks equity in the property.

43. The CBGB Assets are unique intellectual property rights, and personalty in the form of unique memorabilia and other items that were part of the CBGB club. Thus, it is very difficult to provide a "standard" appraisal of the assets in the same way one would when dealing with real property, or an operating business. In order to determine the value of these unique assets, the Co-Executors considered a number of factors as set forth in the Green Affidavit and above. Those factors are as follows:

- The CBGB Assets were sold to the Debtor two years ago for $3,500,000, which was at the time determined to be the best offer after a robust marketing. The

Debtor has been unable to even remain current on interest payments on its debt from the funds raised from the use of the CBGB Assets.

- When the CBGB Assets were sold to the Debtor in 2008, the club had been closed for little more than a year, and CBGB was constantly in the press garnering significant name recognition and cache. In the last two years, the amount of press and interest has decreased, further impacting on value.

- As contemplated by the Forbearance Agreement, the Debtor has been actively marketing and trying to sell the CBGB Assets for an amount that would at least satisfy the obligations to the Kristal Estate, but has been unable to do so. The Debtor's failed efforts indicate an unlikelihood that the CBGB Assets will fetch sufficient value to even satisfy the Amended Note.

- After reaching out to certain parties that were interested in purchasing the CBGB Assets in early-2008, the tentative, non-binding offers to purchase the CBGB Assets now are for approximately $2.6 million.

Green Affidavit, ¶29.

44. Brett Green was counsel to Hilly Kristal since in or around 1997, and the legal professional charged with protecting the CBGB Assets since that time until they were transferred to the Debtor. Mr. Green is a Co-Executor of the Kristal Estate and as such was charged with the duty of maintaining the CBGB Assets until they were eventually sold to the Debtor, for marketing and selling the CBGB Assets and maximizing their value, and for protecting the Kristal Estate's interest in the Amended Note and collateral. Accordingly, Mr. Green is fully familiar with the assets and the Court can consider his opinion on value. See In re Hirsch, 351 B.R. 291 (Bankr. E.D.N.Y. 2006) (the owner with the knowledge of the property's condition and purchase price is cometent to give his opinion the property's value).

45. In addition, the Debtor's own failure to make money from the CBGB Assets or locate a buyer for the assets is perhaps the best evidence of the Debtor's lack of equity. Indeed, to the extent the Debtor contests the Kristal Estate's assertion that the Debtor lacks equity in the assets, the Debtor's own testimony regarding its failed use and marketing of the assets will demonstrate that the Debtor has no equity in the Kristal Estate's collateral.

15

**b.     The Debtor's Filing was in Bad Faith**

46.     In In re Balco, this Court held that cause for relief from the stay under section 363(d)(1) "may be found based on enumerated factors, including 'bad faith.'" 312 B.R. 734, 748 (Bankr. S.D.N.Y. 2004).  According to this Court, the factors indicative of bad faith are as follows:

   (i)     The debtor has only one asset;

   (ii)    The debtor has few unsecured creditors whose claims are small in relation to those of the secured creditor;

   (iii)   The debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;

   (iv)    The debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;

   (v)     The timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;

   (vi)    The debtor has little or no cash flow;

   (vii)   The debtor can't meet current expenses including the payment of personal property and real estate taxes; and

   (viii)  The debtor has no employees.

Id. at 753.

47.     Most, if not all, of the Balco factors are evidenced here.  Each factor is analyzed in the order they are listed in the decision and preceding paragraph:

   (i)     The Debtor's only known assets are the CBGB Assets that are the subject of the Kristal Estate's lien.

   (ii)    The Debtor has very few actual unsecured creditors.  The primary unsecured creditors according to the Debtor's lists are (a) Bravado International Group, with an unsecured, contingent claim of

16

$250,000[4]; (b) Brown Rudnick, LLP, for $665,000[5]; and (c) a claim of insider and member, James Blueweiss, or his company, Kismet Media Group, of $98,190. The Debtor also owes Lisa Kristal Burgman, one of the Co-Executors, over $160,000 pursuant to a consulting agreement, but failed to list that claim on its List of 20 Largest Unsecured Creditors.

(iii) The Debtor's only assets, the CBGB Assets, were technically transferred back to the Kristal Estate prior to the Petition Date, and were going to be sold by the Kristal Estate as soon as a buyer was located. The Debtor's management even seemingly acquiesced to the transfer by passing on the attorney relationship with Dechert LLP, and reminding the Kristal Estate to deal with storage and insurance on the property.

(iv) The Debtor's financial condition is, in essence, a two party dispute between the Debtor and the Kristal Estate. The Kristal Estate already obtained title to the CBGB Assets prior to the Petition Date, and the Debtor knowingly and voluntarily waived its rights to contest the Kristal Estate's foreclosure pursuant to the Forbearance Agreement.

(v) The timing of the Debtor's filing only indicates an intent to frustrate and delay the Kristal Estate's disposition of the CBGB Assets. The filing came twenty-four (24) days after the Debtor defaulted on the terms of the Amended Note and Forbearance Agreement, which triggered the transfer of the CBGB Assets from the Debtor to the Kristal Estate. The Kristal Estate already took steps to take possession of the assets, pay counsel and manage the BCBG litigation, and record the transfer of certain trademarks with the U.S. Patent and Trademark Office.

(vi) To the best of the Kristal Estate's knowledge, the Debtor has little or no cash flow.

(vii) The Debtor can't meet current expenses. After several extensions, the Debtor has defaulted on its obligations under the Amended Note and the note is now fully mature, due and payable. The Debtor has also failed to pay legal fees to Dechert LLP in connection with the preservation of intellectual property rights in the European Community.

---

[4] As set forth in the Green Affidavit, the Kristal Estate believes that the Debtor transferred certain rights to distribution CBGB T-Shirts to Bravado in violation of the APA and Security Agreements, and that Bravado has significantly underperformed with respect to its obligations to market and sell the T-Shirts.

[5] The Kristal Estate cannot understand from its knowledge of the Debtor's business how the Debtor incurred legal fees of $665,000.

17

(viii) To the best of the Kristal Estate's knowledge, the Debtor has no employees.

48. For all the foregoing reasons, this Court can and should grant the Kristal Estate relief from the automatic stay because the filing was in bad faith.

**c.    The Debtor has no Prospect of Reorganization**

49. In <u>United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.</u>, 484 U.S. 365, 376, 108 S. Ct. 626, 98 L. Ed. 2d 740 (1998), the Supreme Court held that to establish that collateral is necessary for an effective reorganization under section 362(d)(2), a debtor must show that the "property is essential for an effective reorganization that is in prospect." This means "a reasonable possibility of a successful reorganization within a reasonable time." <u>Id</u>.; <u>In re Diplomatic Electronic Corp.</u>, 82 B.R. 688, 693 (Bankr. S.D.N.Y. 1988) (no sufficient showing of effective reorganization where "the debtors' hopes and aspirations for reorganization, although well-intended, have not been supplemented by any showing that a reorganization is possible, let alone reasonably likely within a reasonable period of time"); <u>In re Local Realty Corp.</u>, Case No. 09-11785 (AJG) (Bankr. S.D.N.Y. 2009) (finding that "the uncertainty of the Debtor's cash flow, combined with the questionable ability of the Debtor to make the indeterminate balloon payment, makes any prospect of successful plan speculative at best").

50. Here, the Debtor has no plan or hope of a reorganization. The Debtor was unable for over two years to generate any significant revenue from the CBGB Assets, sell the CBGB Assets for an amount sufficient to satisfy the secured debt, or protect the CBGB Assets from waste and damage. The Kristal Estate has given the Debtor several chances by, for example, expanding the repayment periods in the Amended Note, and forbearing its foreclosure rights in the Forbearance Agreement. It is inconceivable to think that the Debtor will be able to accomplish anything now in chapter 11.

18

51. The Debtor filed a skeleton petition twenty-four (24) days after its assets were transferred to the Kristal Estate pursuant to the express terms of the Forbearance Agreement. Also, since the May 18th defaults, the Debtor has not exercised any dominion or control over the assets, turning over the rights and related attorney-client relationships to the Kristal Estate.

52. The Debtor has not given this Court or creditors any idea how it plans to reorganize. Nor has the Debtor sought authorization to use the Kristal Estate's cash collateral. The Debtor's filing is merely a stall tactic designed to try to gain some leverage in negotiating with the Kristal Estate. That is not a permissible agenda.

53. For the foregoing reasons, the Kristal Estate should be granted relief from the automatic stay because the Debtor is unable to reorganize.

## NOTICE

54. Notice of the instant application will be provided to counsel to the Debtor, counsel to the Creditors' Committee (if any), the Debtor's Twenty Largest Unsecured Creditors, and the Office of the United States Trustee. The Kristal Estate respectfully submits that the foregoing notice is good and sufficient, and no further or additional notice need be given of this application or the relief sought herein.

## NO PRIOR RELIEF

55. No other application for the relief sought herein has been made by the Kristal Estate to this or any other court.

**WHEREFORE**, the Kristal Estate respectfully request that this Court enter an order (i) granting it relief from the automatic stay allowing it to liquidate the CBGB Assets and apply the proceeds to satisfy its lien, or alternatively, granting it adequate protection, (ii)

dismissing the Debtor's chapter 11 case, and (iii) granting the Kristal Estate such other and further relief as is just.

Dated: New York, New York
   June 24, 2010

               FOX ROTHSCHILD LLP

              By:  */s/ Fred Stevens*
                 Fred Stevens
                 100 Park Avenue, 15th Floor
                 New York, New York 10017
                 (212) 878-7900

                 *Counsel to the Estate of Hillel Kristal*