UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re:                                                  :
                                                        :        Chapter 11
CBGB HOLDINGS, LLC,                                     :        Case No.: 10-13130 (SMB)
                                                        :
                          Debtor.                       :
-------------------------------------------------------X

## MEMORANDUM DECISION AND ORDER
## REGARDING VALIDITY OF STRICT FORECLOSURE

**A P P E A R A N C E S:**

FOX ROTHSCHILD LLP
Attorneys for the Estate of Hillel Kristal
100 Park Avenue, 15th Floor
New York, NY 10017

          Fred Stevens, Esq.
          Kathleen Aiello, Esq.
                    Of Counsel


McBREEN & KOPKO
Attorneys for Debtor and Debtor in Possession
500 North Broadway, Suite 129
Jericho, NY, 11753

          Kenneth Reynolds, Esq.
                    Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

          The debtor's secured creditor, contending that it strictly foreclosed on substantially all of

the debtor's assets prior to the petition date, has moved to dismiss this chapter 11 case, or

alternatively, for relief from the stay.  Although the motion raises several issues, the validity of

the strict foreclosure presents a threshold question.  For the reasons that follow, the Court

concludes that the strict foreclosure was valid.

## BACKGROUND

CBGB, founded by Hillel "Hilly" Kristal, operated as a music club in the East Village for

three decades, until it closed on October 15, 2006.  Following Kristal's death, his estate (the

"Kristal Estate") entered into an Asset Purchase Agreement (the "APA")[1] on May 18, 2008, to

sell substantially all of CBGB's assets (the "Assets") to the debtor.[2]  The debtor paid $112,500

in advance, and agreed to pay $1 million at the closing, and deliver a promissory note in the face

amount of $2,387,500 (the "Note").  The debtor's obligations under the Note were secured by the

Assets pursuant to two security agreements signed simultaneously with the APA and Note.  The

Kristal Estate perfected its security interest on June 4, 2008.

As part of the transaction, the debtor delivered certain documents into escrow (the

"Escrowed Documents") as additional security for the Note.[3]  (APA at § 9.1(d)(iii)-(iv); Green

Affidavit, Ex. F ("Escrow Agreement"), at ¶ C.)  It appears that the Escrowed Documents were

---

[1]      The APA is annexed as Exhibit A to the Affidavit of Brett Green, Co-Executor of the Estate of Hillel
Kristal, in Support of the Estate's Motions for Orders: (i) Pursuant to 11 U.S.C. Section 362(d), and Fed. R. Bankr.
P. 4001, Granting Lender Relief From the Automatic Stay So That It Can Continue Its Strict Foreclosure and
Liquidation of Its Collateral in Satisfaction of Its Liens; and (ii) Pursuant to 11 U.S.C. Section 1112(b), Dismissing
Debtor's Case, dated June 24, 2010 ("Green Affidavit") (ECF Doc. # 12).  The APA is governed by New York law.
(APA at § 12.12.)

[2]      The Assets included: (a) domestic and international trademarks and service marks or applications,
copyrights, names, slogans, characters, symbols and designs associated with the CBGB business, (b) telephone,
telecopy, websites, domain names, email addresses and listings related to the CBGB business, (c) video and audio
recordings and photographs, (d) all contracts and various receivables, (e) data and records related to the operations
of the CBGB business, (f) claims relating to the Assets accruing on or after the Closing Date, and (g) all warehouse
inventory and physical property pertaining to the CBGB club.  (APA at § 2.1(a)(i)-(x).)

[3]      The debtor also delivered a portion of the purchase price ($550,000) into escrow to protect the debtor
against a litigation contingency involving title to CBGB's intellectual property. (APA at § 3.2.)

designed to unwind the transaction and transfer the Assets back to the Kristal Estate in the event of the uncured default by the debtor.[4]  (See Green Affidavit at ¶ 13.)

The parties subsequently modified the transaction, and the debtor executed the Amended and Restated Promissory Note, dated as of May 21, 2008 ("Amended Note").[5]  The Amended Note provided several remedies to the Kristal Estate in the event the debtor defaulted on its obligations.  All unpaid principal and interest would become immediately due and payable without presentation, demand or notice to the debtor.  (Amended Note at 3.)  In addition, the Kristal Estate could exercise all rights available to it as a secured creditor, including rights remedies under Article 9 of the New York Uniform Commercial Code ("UCC").  (Id.)  Finally, the Kristal Estate could, upon notice to the debtor, obtain the release of the escrowed funds and the Escrowed Documents.  (Id.)

The Amended Note came due on February 12, 2010.  The debtor defaulted, and on or about February 24, 2010, the Kristal Estate issued a Notice of Default.  Subsequent to the default notice, on March 24, 2010, the debtor and the Kristal Estate entered into the Surrender of Collateral, Consent to Strict Foreclosure, and Release Agreement, dated as of Feb. 12, 2010 (the "Agreement").[6]  This Agreement is the source of the current controversy.  It provided, in pertinent part, that the debtor acknowledged its default, (id. at ¶ 1), and the Kristal Estate agreed

---

[4]    The Green Affidavit, (¶ 12), described the Escrowed Documents and purported to attach them.  At least some of the attachments appear to be the transfer documents that the Kristal Estate delivered to the debtor at the closing pursuant to § 2.3 of the APA rather than the documents the debtor delivered to the escrow agent.  (See Green Affidavit, Ex. G, I, J.)  The ambiguity does not affect the disposition of the matter.

[5]    The Amended Note is annexed as Exhibit K to the Green Affidavit.  Like the APA, it is governed by New York law.  (Amended Note at 3.)

[6]    The Agreement is annexed as Exhibit N to the Green Affidavit.

to forbear from exercising its remedies until May 18, 2010.  (Id. at ¶ 3.)  During the interim (the

"Compliance Period"), the debtor could satisfy its obligation under the Amended Note by paying

it or by selling the collateral and providing for the repayment of the debt on terms acceptable to

the Kristal Estate.  (Id.)  If the debtor failed to satisfy its debt within the time frames set forth in

the Agreement, the Kristal Estate could, without further notice, foreclose on the collateral in

accordance with the Agreement, (id. at ¶ 4), and "possess and retain" the collateral pursuant to

the provisions of "Section 962 [sic]" of Article 9 of the UCC.  (Id. at ¶ 5.)  The debtor

acknowledged that it had received sufficient notice under UCC §§ 9-620 and 9-621, and

alternatively, waived any additional notice.  (Id. at ¶ 6.)

    The debtor failed to satisfy its obligations during the Compliance Period.  Without

serving an additional notice of default, the Kristal Estate sought to effect a strict foreclosure.  On

May 27, 2010, the Kristal Estate delivered a Direction Letter to the escrow agent, and obtained

the Escrowed Documents.[7]  (Green Affidavit at ¶ 22.)  On June 4, 2010, the Kristal Estate sent

letters to known counterparties to the debtor's contracts informing them that the Assets had been

transferred back to the Kristal Estate, (Green Affidavit at ¶ 23), and on June 10, 2010, the Kristal

Estate recorded the assignment of trademarks for the four versions of CBGB, CBGB & OMFUG,

and the pending application for "CBGB 315 Bowery."  (Green Affidavit at ¶ 25; see United

States Patent and Trademark Office Notice of Recordation of Assignment Document, dated June

11, 2010 ("US PTO Notice").) [8]

---

[7]    The Direction Letter is annexed as Exhibit M to the Green Affidavit.

[8]    The US PTO Notice is annexed as Exhibit O to the Green Affidavit.

The debtor filed this chapter 11 case on June 10, 2010.  The Kristal Estate subsequently

moved to dismiss the case pursuant to 11 U.S.C § 1112(b) arguing that it owned the Assets.

Alternatively, and to the extent that the strict foreclosure was defective, the Kristal Estate sought

relief from the automatic stay to enforce its security interest in the Assets.

The resolution of the motion depends in large part on who owned the Assets on the

petition date.  The Kristal Estate contends that it acquired the assets through strict foreclosure

before the petition date, while the debtor contends that the strict foreclosure was invalid under

UCC § 9-620.  The debtor also contends that the Agreement is unconscionable and

unenforceable and the alleged prepetition transfer of the Assets to the Kristal Estate would be a

voidable preference.

## DISCUSSION

Section 9-620 of the Uniform Commercial Code governs strict foreclosure – a procedure

through which a secured creditor may retain its collateral in full or partial satisfaction of its

claim.[9]  See UCC § 9-622 (a)(1) & (2);[10] see generally 4 JAMES J. WHITE & ROBERT S.

---

[9]     N.Y. U.C.C. § 9-620 (McKinney 2010) provides, in pertinent part:

(a) Except as otherwise provided in subsections (g) and (h), a secured party may accept collateral
in full or partial satisfaction of the obligation it secures only if:

(1) the debtor consents to the acceptance under subsection (c) . . . .

. . . .

 (c) Debtor's consent.  For purposes of this section:

(1) a debtor consents to an acceptance of collateral in partial satisfaction of the obligation it
secures only if the debtor agrees to the terms of the acceptance in a record authenticated after
default; and

(2) a debtor consents to an acceptance of collateral in full satisfaction of the obligation it secures
only if the debtor agrees to the terms of the acceptance in a record authenticated after default or
the secured party:

(A) sends to the debtor after default a proposal that is unconditional or subject only to a
condition that collateral not in the possession of the secured party be preserved or maintained;

5

SUMMERS, UNIFORM COMMERCIAL CODE § 34-10 (5th ed. 2002) ("WHITE & SUMMERS").  The remedy is only available if the debtor consents to strict foreclosure <u>after</u> it has defaulted.  Thus, for example, the debtor cannot consent to strict foreclosure in anticipation of a future default at the time it enters into the transaction that creates the debt and security interest.

The form of the debtor's consent depends on whether the strict foreclosure is partial or full.  In the case of partial strict foreclosure, the debtor must expressly consent "to the terms of the acceptance in a record authenticated after default."  UCC § 9-620(c)(1).  In contrast, the debtor may consent to full strict foreclosure – the complete satisfaction of its debt – either expressly or by implication.  As with partial strict foreclosure, it can expressly consent "to the terms of the acceptance in a record authenticated after default."  UCC § 9-620(c)(2). Alternatively, after default, the secured party can send a "proposal"[11] to the debtor "that is unconditional or subject only to a condition that collateral not in the possession of the secured party be preserved or maintained," UCC § 9-620(c)(2)(A), and "proposes to accept collateral in full satisfaction of the obligation it secures."  UCC § 9-620(c)(2)(B).  The debtor then has twenty

---

(B) in the proposal, proposes to accept collateral in full satisfaction of the obligation it secures; and

(C) does not receive a notification of objection authenticated by the debtor within twenty days after the proposal is sent.

[10]    N.Y. U.C.C. § 9-622(a) (McKinney 2010) states:

A secured party's acceptance of collateral in full or partial satisfaction of the obligation it secures:

(1) discharges the obligation to the extent consented to by the debtor;

(2) transfers to the secured party all of a debtor's rights in the collateral;

(3) discharges the security interest or agricultural lien that is the subject of the debtor's consent and any subordinate security interest or other subordinate lien; and

(4) terminates any other subordinate interest.

[11]    "'Proposal' means a record authenticated by a secured party which includes the terms on which the secured party is willing to accept collateral in full or partial satisfaction of the obligation it secures pursuant to Sections 9-620, 9-621, and 9-622."  UCC § 9-102(66).

days to object to the proposal.  UCC § 9-620(c)(2)(C).  If it does not object, it is deemed to have accepted the proposal.  4 WHITE & SUMMERS § 324-10, at 394 ("[T]he debtor's silence for 20 days seals the deal.")  The requirements of § 9-620(c) may not be waived.  UCC § 9-602(j); 4 WHITE & SUMMERS § 34-10, at 396 ("Section 9-602(10) explicitly prohibits waiver of the 'rules' stated in 9-620 . . . .").[12]

Here, the debtor consented to strict foreclosure by the Kristal Estate following the February 12, 2010 default, subject, however, to the debtor's ability to satisfy the Note in accordance with the Agreement during the Compliance Period.  (Debtor's § 1112 Objection at ¶ 55 ("[B]y signing the Forbearance Agreement, the Debtor agreed to the Kristal Estate having an option to strictly foreclose in case of the Debtor's default under the Forbearance Agreement.") (ECF #21).)  Furthermore, although the Agreement is silent, the debtor understood that the Agreement contemplated full strict foreclosure.  (See id. at ¶ 49) ("The Forbearance Agreement itself does not constitute either (a) a post-default written consent by the Debtor, or (b) a post-default unconditional proposal by the Kristal Estate to accept collateral in full satisfaction of the obligation it secures, as such consent and/or proposal was neither post-default, nor

---

[12]    Section 9-621 also requires the secured party to provide notice of the proposed strict foreclosure to any third parties who assert an interest in the collateral.  In the case of partial strict foreclosure, the secured party must also provide notice to any secondary obligor.  The secured party may not strictly foreclose if it receives a timely objection from one of the noticed parties or any other party holding a subordinate interest in the collateral.  UCC § 9-620(a)(2).  However, the failure to notify these parties does not invalidate the foreclosure.  4 WHITE & SUMMERS § 34-10, at 394.

The debtor contends that Bravado International Group Merchandising Services was entitled to notice under § 9-621.  (See Debtor's Objection to Motion of the Estate of Hillel Kristal for an Order Pursuant to 11 U.S.C. § 1112(b), Dismissing the Debtor's Case, dated July 15, 2010, at ¶¶ 59-60 ("Debtor's § 1112 Objection") (ECF Doc. # 21).)  The debtor scheduled Bravado as a contingent, disputed unsecured creditor.  (Schedule F (ECF Doc. # 13).)  In fact, the Kristal Estate was the only secured creditor listed by the debtor.  (See Schedule D.)  Finally, the debtor did not identify any co-debtors.  (Schedule H.)  Consequently, no other party was entitled to notice or the right to object.

unconditional.")  The Agreement satisfies the express consent requirement under UCC § 9-620(c)(2) if the default occurred on February 12, 2010.

The debtor contends, however, that the February 12, 2010 default is irrelevant.  Instead, it maintains that its failure to satisfy its obligations during the Compliance Period in accordance with the Agreement constituted the relevant default for purposes of § 9-620.  Consequently, the Kristal Estate had to obtain the debtor's post-default consent after the Compliance Period – which it did not do – and the debtor's waiver of any further notices required by UCC §§ 9-620 and 9-621, (see Agreement at ¶ 6) is unenforceable.

The Court concludes that the relevant default occurred on February 12, 2010, when the debtor failed to meet its obligations under the Amended Note.  The Kristal Estate then gave the debtor an opportunity to cure that default by redeeming or selling the collateral during the Compliance Period.  The debtor's failure to redeem or sell the collateral under the Agreement was not a default.  "Default" is not defined under Article 9 or in the Agreement, but in common parlance, "default" means "[t]he omission or failure to perform a legal or contractual duty [or] the failure to pay a debt when due."  BLACK'S LAW DICTIONARY 480 (9th ed. 2009).  The debtor was not contractually obligated to redeem or sell the collateral under the Agreement, and its failure to do so was not a default and did not give rise to liability.  Instead, the Agreement afforded the debtor an opportunity to cure its existing default under the Amended Note.  Hence, the debtor's consent contained in the Agreement was sufficient under UCC § 9-620(c).  See Martin-Musumeci v. Law Offices of Herbert Hafif Profit and Pension Sharing Plan (In re Martin-Musumeci), 19 F.3d 28 (table), 1994 WL 83413, at *4 (9th Cir. Mar. 10, 2004) (affirming lower court determination that notice of strict foreclosure that gave debtor 90 days to find buyer was sufficient under predecessor to UCC § 9-620).

8

The debtor's authorities are distinguishable, and do not support the argument that the

Kristal Estate was required to procure the debtor's consent to strict foreclosure following its

failure to redeem or sell during the Compliance Period.  Most of the authorities are cited and

stand for the undisputed proposition that the debtor's pre-default consent to strict foreclosure is

insufficient to satisfy the statutory requirements under UCC § 9-620 or its predecessor, UCC § 9-

505(2).  E.g., Forbes v. Four Queens Enters., Inc., 210 B.R. 905, 910 (D.R.I. 1997) ("The

original contract signed by Forbes [which authorized the secured creditor to retain the collateral]

was not signed after default, and does not satisfy the written notice requirement of N.Y.U.C.C. §

9-505(2)."), aff'g in part and rev'g in part, 191 B.R. 510 (Bankr. D.R.I. 1996); In re Cadiz

Props., Inc., 278 B.R. 744, 749 (Bankr. N.D. Tex. 2002) ("The record does not contain evidence

that [the debtor] agreed to the terms of the stock transfer 'after default.'  Nor does the record

contain evidence that [the secured party] sent a proposal to [the debtor] 'after default' thereby

triggering the twenty day objection time."); Chen v. Profit Sharing Plan of Dr. Donald H. Bohne,

DDS, P.A., 456 S.E.2d 237, 240 (Ga. Ct. App. 1995) ("[T]he condition in the 'ADDENDUM'

providing for full and complete assignment and transfer of the collateral upon default by Chen

amounted to nothing more than an unenforceable attempt at predefault waiver of the debtor's

rights under Article 9 of Georgia's Uniform Commercial Code."); Emmons v. Lemaster, Inc., 10

P.3d 33, 36 (Kan. Ct. App. 2000) ("LeMaster has produced no other evidence indicating that he

gave notice of strict foreclosure to Emmons or that she renounced after default her right to

receive notice.").  No one takes issue with the proposition but here, the Kristal Estate is relying

on the post-default consent to strict foreclosure contained in the Agreement.

Citing Fletcher v. Cobuzzi, 499 F. Supp. 694 (W.D. Pa. 1980) and Royal Palm Senior

Investors, LLC v. Carbon Capital Inc., No. 08-4319, 2009 WL 1941862 (S.D.N.Y. July 7, 2009),

the debtor also argues that a post-default settlement agreement between the debtor and secured

creditor which grants the secured party the right to foreclose is insufficient, standing alone, to

effectuate a valid acceptance of a strict foreclosure proposal. (See Debtor's Memorandum of

Law in Further Opposition to Motions of the Estate of Hillel Kristal for an [sic] Orders Pursuant

to 11 U.S.C. §362(d) and Fed. R. Bankr. P. 4001, Granting Lender Relief from the Automatic

Stay, Granting Lender Adequate Protection, and Dismissal Pursuant to 11 U.S.C. §1112(b),

dated Sept. 10, 2010 ("Opposition Memo"), at ¶ 15 (ECF Doc. # 33.)[13]  In Fletcher, Villa, Inc.

purchased assets from Cobuzzi and Country Villa, Inc.  Id. at 695.  Following a series of defaults

and supplemental agreements, Fletcher pledged stock to secure the payment obligations, and

Cobuzzi also had the right to demand more collateral if its value dropped below a certain

percentage of the debt.  Id. at 695-96.  If Fletcher failed to pledge more stock within thirty days

of Cobuzzi's written demand, Cobuzzi could foreclose on the collateral.  Id. at 696.

Approximately one year later, Cobuzzi demanded that Fletcher deliver an additional

pledge of 1,800 shares together with stock powers, warning that the failure to do so would be

considered a default under the parties' agreement.  Id.  Fletcher refused, and Cobuzzi eventually

caused the pledged stock to be transferred into his name.  Id.  Cobuzzi treated the transfer as a

foreclosure, and in an undisclosed affidavit executed simultaneously with the transfer, Cobuzzi

stated that he considered the debt cancelled despite the remaining deficit.  Id.

The pledged stock rose in value to the point where the value of stock sold or still held by

Cobuzzi exceeded the amount of the debt.  In the ensuing litigation between Fletcher and

---

[13]     The final line or lines in paragraph 15 of the Opposition Memo were dropped from the versions filed on
ECF and delivered to the Court.  Nevertheless, the missing information is apparent from the context.

Cobuzzi, one of the many issues concerned the ownership of the pledged stock, and the validity

of Cobuzzi's strict foreclosure.  The Court concluded that Cobuzzi's notice or proposal of strict

foreclosure did not satisfy UCC § 9-505(b).  The court explained that "[t]he notice must be of

strict foreclosure in particular, and not simply of an intent to foreclose."  Id. at 699.  Cobuzzi's

pre-foreclosure notices did not refer to his intention to retain the collateral rather than dispose of

it by sale or otherwise.  Furthermore, the affidavit executed at the time of the foreclosure was

never delivered to Fletcher.

    In the present case, the Kristal Estate gave sufficient notice of its intent to strictly

foreclose in accordance with Article 9.  As previously discussed, the debtor read the Agreement

as its consent to strict foreclosure if it failed to satisfy the debt during the Compliance Period.  In

that event, the Kristal Estate could possess and retain the collateral in accordance with the

transaction documents and "the provisions of Section 962 [sic] of Article 9 of the UCC."

(Agreement at ¶ 5.)  Although the debtor maintains that the default occurred afterwards at the

conclusion of the Compliance Period, the Court has rejected that argument.  Hence, Fletcher is

not apposite.

    In Royal Palm, the debtor's other authority, the plaintiff borrowed approximately $25

million from the defendant to purchase the Royal Palm Hotel (the "Hotel"), and pledged its

membership interests in the Royal Palm Hotel Properties, LLC, which owned the Hotel.  2009

WL 1941862, at *1.  The plaintiff's principal (Mitchell) guaranteed the debt.  Id.  Following a

default, the parties entered into a settlement agreement.  The defendant waived all existing

defaults and agreed to forbear from exercising its rights.  The plaintiff agreed to satisfy its

obligations by a future date, and if it did not, 99.9% of its membership interests in the Hotel

11

would automatically transfer to the defendant.  Id.  In addition, if a Termination Event occurred, the automatic conveyance of the ownership interests increased to 100%.  Id. at *2.

The defendant subsequently sent notice of a Termination Event (the plaintiff also failed to satisfy the debt), and eventually noticed a foreclosure sale.  Id.  One day before the scheduled sale, the plaintiff delivered the requisite documents transferring the membership interests to the defendant, who became the owner and managing member of the Hotel.  Id.  The next day, the plaintiff filed a chapter 11 petition which stayed the sale, but the petition was eventually dismissed.  The foreclosure sale had not occurred by the time the District Court rendered its decision.  Id.

In the ensuing litigation, the plaintiff contended that the defendant did not own the membership interests.  Among other things, it alleged that the settlement agreement did not effect a strict foreclosure because the defendant did not make the proposal to accept the membership interests in satisfaction of the debt, notify the requisite parties or obtain the debtor's consent to acceptance.  Id. at *3.  The defendant counterclaimed, moved to dismiss the complaint, and moved for summary judgment on its counterclaims against Mitchell.

The District Court concluded that since the defendant never elected to avail itself of the remedy of strict foreclosure, § 9-620 was inapplicable.  Id.  The settlement agreement did not state that the defendant would accept the collateral in satisfaction of the debt, and the defendant did not send written notice of its intention to do so.  Id.  Instead, the defendant chose to exercise its right to sell the collateral in a commercially reasonable manner in accordance with UCC § 9-610, an alternative to strict foreclosure.  Id. at *4.  Here, the Kristal Estate did intend to exercise

12

the remedy of strict foreclosure, and the Agreement satisfies the requirement for the debtor's consent.

With one exception, the debtor's remaining arguments merit only brief comment. The attack on the "waiver" provision in the Agreement, including the charges of bad faith, is predicated on the debtor's position that the default occurred after the Compliance Period, but the Court has concluded that it occurred on February 12, 2010. As a result, there was no pre-default waiver. Furthermore, as explained in an earlier footnote, the Kristal Estate was not required to provide notice of the strict foreclosure to any other parties because no other parties were entitled to notice under § 9-621.

The debtor's contention that the Agreement is a "conditional" proposal in violation of UCC § 9-620(c)(2)(A) is also wrong. The argument is based on the language in paragraph 4 that if the debtor failed to satisfy its obligation during the Compliance Period, "the Secured Party may, without any further notice or obligation to the Debtor, immediately and finally foreclose on the Collateral." (Emphasis added.) Section 9-620(c)(2)(A) governs the "proposal" process; it enables the secured party to obtain the debtor's implied consent to full strict foreclosure. The Kristal Estate did not send a proposal and has not argued that it procured the debtor's implied consent based on the failure to object to a proposal. Instead, the Kristal Estate obtained the debtor's express consent through the Agreement. In any event, even if Kristal Estate sent a "proposal" that was "conditional," the debtor's express consent in the Agreement rendered it effective. UCC § 9-620, Official Comment 4 ("[A] conditional proposal generally requires the debtor's agreement in order to take effect.").

13

The debtor also fails to explain why the transfer of the Assets to the Kristal Estate would be a preference.  While the Court is not deciding the issue, it does not appear that the debtor could satisfy 11 U.S.C. § 547(b)(5).  The Kristal Estate is secured, and the debtor has not shown that the value of the Assets exceeded the debt they secured.  In that event, the strict foreclosure resulted in the satisfaction of the Kristal Estate's secured claim as well as any deficiency claim.  In a hypothetical chapter 7 case, the Kristal Estate would recover the same collateral in satisfaction of its secured claim, leaving the deficiency claim unsatisfied.  See Dietz v. Hanson (In re Hanson Restaurants, Inc.), 155 B.R. 758, 760 (Bankr. D. Minn. 1993)( The pre-petition transfer of collateral to an undersecured lien creditor does not diminish the estate by allowing the transferee to receive more than it would receive "if the transfer had not been made and the case was a case under Chapter 7 at the time of the transfer.")(footnote omitted).[14]  In any event, preferentially transferred property does not become property of the estate until it has been recovered.  See 11 U.S.C. § 541(a)(3); cf. FDIC v. Hirsch (In re Colonial Realty Co.), 980 F.2d 125, 131 (2d Cir. 1992) (fraudulently transferred property does not become property of the estate until it is recovered).  Even if the Assets were preferentially transferred to the Kristal Estate, the latter still owned them as of the petition date.

---

[14]     The district court in Deutsche Bank Secs., Inc. v. Kendell (In re Consilent, Inc.), No. C 05-2430 (CW), 2006 WL 335415 (N.D. Feb. 14, 2006) was "unpersuaded" by the statement in Hanson that "a transfer to an undersecured, perfected, first priority creditor toward satisfaction of its debt, cannot be a preferential transfer to either the obligee or its guarantor" because the transfer does not diminish the estate.  Id. at *3 (quoting Hanson Restaurant, 155 B.R. at 760.  The district court based its disagreement on the presumption that the secured creditor applies the transfer to the undersecured portion of the claim.  Deutsche Bank, 2006 WL 335415, at *3.

          With respect, when the secured creditor receives its collateral rather than a payment, the transfer of the collateral necessarily reduces the amount of remaining collateral, and hence, the amount of the secured debt.  In addition, where, as in Hanson and in this case, the transfer satisfies all of the debt, secured and unsecured, the presumption is inapplicable.

The debtor's claim of unconscionability merits more discussion.  Citing Brennan v. Bally Total Fitness, 153 F. Supp. 2d 408 (S.D.N.Y. 2001), the debtor asserts that the waiver clause, coupled with the debtor's lack of "meaningful bargaining power" and a "meaningful choice," rendered the Agreement unconscionable.  (Debtor's § 1112 Objection at ¶ 36; Debtor's Opposition to Motion of the Estate of Hillel Kristal for an Order Pursuant to 11 U.S.C. §362(d) and Fed. R. Bankr. P. 4001, Granting Lender Relief from the Automatic Stay and Granting Lender Adequate Protection, dated July 15, 2010, at ¶ 41 (ECF Doc. # 20).)

The party invoking the doctrine of unconscionability must show both an absence of meaningful choice in the contract formation process and contract terms unreasonably favoring the other party, i.e., procedural and substantive unconscionability.  Brennan, 153 F. Supp. 2d at 416; Fleischmann Distilling Corp. v. Distillers Co., 395 F. Supp. 221, 232-33 (S.D.N.Y. 1975); Gillman v. Chase Manhattan Bank, N.A., 534 N.E.2d 824, 828 (N.Y. 1988).  The doctrine is "intended to be sensitive to the realities and nuances of the bargaining process."  Gillman, 534 N.E.2d at 828 (quoting State of New York v. Avco Fin. Serv. of New York, Inc., 406 N.E.2d 1075, 1078 (N.Y. 1980)).  It has little applicability in a commercial setting, and is intended primarily to protect the "commercially illiterate consumer beguiled into a grossly unfair bargain by a deceptive vendor or finance company."  Equitable Lumber Corp. v. IPA Land Dev. Corp., 344 N.E.2d 391, 396 (N.Y. 1976); accord NML Capital v. Republic of Argentina, No. 09-2707-cv (L), 2010 WL 3704570, at *5 (2d Cir. Sept. 23, 2010) ("The doctrine of unconscionability seeks to prevent sophisticated parties with grossly unequal bargaining power from taking advantage of less sophisticated parties.") (quoting United States v. Martinez, 151 F.3d 68, 74 (2d Cir.1998), cert. denied, 526 U.S. 1020 (1999)).  It is extremely rare for a court to find unconscionability in a contract between experienced businessmen arising in a commercial

setting.  See, e.g., PC Com, Inc. v. Proteon, Inc., 946 F. Supp. 1125, 1138 (S.D.N.Y. 1997)

("Numerous cases have found that the doctrine of unconscionability is not typically applied to

commercial dealings between business entities.") (citation and internal quotation marks omitted);

Am. Elec. Power Co. v. Westinghouse Elec. Corp., 418 F. Supp. 435, 458 n.41 (S.D.N.Y. 1976)

("Unconscionability rarely exists in a commercial setting involving parties of equal bargaining

power."); County Asphalt, Inc. v. Lewis Welding & Eng'g Corp., 323 F. Supp. 1300, 1308

(S.D.N.Y. 1970) ("[I]t is the exceptional commercial setting where a claim of unconscionability

will be allowed."), aff'd, 444 F.2d 372 (2d Cir. 1971), cert. denied, 404 U.S. 939 (1971).

The debtor invokes the doctrine, pointing solely to the waiver provision, and fails to raise

a colorable claim of unconscionability.  The debtor purchased the Assets on credit, and pledged

the Assets to secure its debt.  It assumed the risk that if it defaulted, the Kristal Estate could

foreclose its security interest.  The debtor eventually defaulted on the Amended Note, triggering

the Kristal Estate's right to foreclose.  Although the Kristal Estate could have immediately

commenced foreclosure proceedings, it agreed to forbear.  Both sides, sophisticated business

people represented by their own counsel, agreed that the debtor would have an opportunity to

satisfy its debt through payment or the sale of the assets.  In exchange, the debtor consented to

strict foreclosure in the event it failed to cure its default.  The terms of the Agreement are neither

outrageous nor one-sided.  Furthermore, the debtor has not submitted any evidence regarding the

negotiations that led to the Agreement, much less proof that the Kristal Estate forced the debtor

into accepting an unfair bargain.  In short, the claim of unconscionability lacks merit.

Accordingly, the Court concludes that the strict foreclosure of the Assets was valid.  The

Court has considered the debtor's remaining arguments, and concludes that they lack merit.  This

does not necessarily resolve the motion to dismiss, and the Court has scheduled an evidentiary

hearing to resolve that matter.

So ordered.

Dated: New York, New York
       October 13, 2010

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge